## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| NANCY GENN,<br>On her behalf and on behalf of her<br>daughter, SARAH ELIZABETH (KATIE)<br>GENN | Case No. 3:12-cv-00704 (CSH) |
| Plaintiffs,<br><br>v. | November 30, 2016 |
| NEW HAVEN BOARD OF EDUCATION;<br>REGINALD MAYO, SUPERINTENDENT OF<br>SCHOOLS; TYPHANIE JACKSON,<br>DIRECTOR OF SPECIAL SERVICES;<br>PATRICIA MOORE, SUPERVISOR OF<br>SPECIAL SERVICES; and KATHRYN<br>CARBONE, PUBLIC HEALTH NURSE<br>DIRECTOR | |
| Defendants. | |

### RULING ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

**HAIGHT, Senior District Judge:**

Plaintiffs, Nancy Genn (the "Parent") and Sarah Elizabeth (Katie) Genn (the "Student"), together bring this action against the Defendant New Haven Board of Education and several individuals who were a part of the New Haven school system. Plaintiffs bring suit pursuant to several statutes, including the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400–1482 ("IDEA"); the Civil Rights Act, 42 U.S.C. § 1983; the Americans with Disabilities Act, 42 U.S.C. § 12117 ("ADA"), Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; and several Connecticut Statutes, to appeal a decision and order of an independent hearing officer (the "IHO") of the State of Connecticut's Department of Education. Both parties have cross-moved for summary judgment. (Doc. 36 and Doc. 37). This Ruling resolves both motions.

## I.  BACKGROUND

The Student was born in 1995. B-2.[1] Beginning at a young age, she suffered a myriad of serious symptoms that were initially diagnosed as bipolar disorder, attention deficit disorder, asthma, and several other serious medical conditions. *Id.* As a result of these medical conditions, the New Haven Board of Education (the "Board") determined that the Student was in need of a special education at a Placement and Planning Team meeting ("PPT") on January 4, 2006. B-14. A PPT, or a "planning and placement team," is a body comprised of school officials and others structured pursuant to Connecticut law (and the IDEA) to make determinations with respect to the special educational needs of students.  Regs. Conn. State Agencies § 10-76a-1(14). At that meeting, the Student was designated to receive special education services, as the result of having an Other Health Impairment ("OHI"). B-14.

Thereafter, several PPT meetings were held to formulate and adjust the Student's Individual Education Program ("IEP"). On May 10, 2006, a PPT was convened to review her IEP. B-16. During that PPT meeting, an assistive technology ("AT") evaluation was arranged for June 19, 2006. B-19. The recommendations included access to special computer software to help the Student with her work. *Id.* On June 20, 2006, another PPT meeting was convened to approve the assistive technology software and to revise the Student's reading goal. B-20.

On December 19, 2006, a PPT meeting was held to discuss the Student's progress with academic and emotional issues. B-24. She was then in a regular education classroom and receiving counseling. *Id.* Another PPT meeting was not convened until September 25, 2007, where the team

---

[1]References to P-[] and B-[] refer to the Parents' and Board's hearing exhibits, respectively. References to Tr. refer to the transcripts of the hearings held before the IHO.

re-evaluated the Student's academic and socialization goals. B-27. Increased support was added for her reading and organizational skills, and her counseling was continued. *Id.* On October 23, 2007, the Student's IEP was modified to address her anxiety related to testing. B-30. Additionally, the Student received another AT consultation in October 2007, which resulted in a recommendation of additional software and training for the Student and the school staff. B-31. These AT recommendations were implemented in a PPT meeting held on November 19, 2007. B-35. Her IEP was also updated during that meeting. *Id.* During the month of November, a review also took place showing that the Student had made progress on her organization and reading goals, and that her self-image was increasing. *Id.*

In January 2008, the Student underwent a Triennial Psychological evaluation. B-37. The evaluation produced numerous recommendations, including: continued instruction to increase reading fluency, increased feedback to make the Student feel more encouraged, frequent checks to ensure the Student understood the instruction, stress management, the assignment of a supportive partner for group activities, a "keep calm" activity, and regular communication between the school staff, the parent, and the Student's psychiatrist. *Id.* At a follow up PPT meeting on January 29, 2008, the Student's IEP was revised after reviewing the Triennial Psychological evaluation. B-38. Her weaknesses were identified as written expression and mathematical calculations. *Id.* The Student also reported having social difficulties with forming friendships. *Id.* The revised IEP contained several accommodations and modifications intended to help the Student meet her IEP goals, including several software programs, testing modifications such as open notes and extra time, organizational help, and daily feedback. *Id.* The PPT met again on October 14, 2008, and added a plan to help meet

3

the organizational goal already in the IEP. B-41.

The next PPT meeting was on January 27, 2009, when the team conducted an annual review. B-43. Noted areas of concern included her completion of homework, her ability to focus for long periods of times, emotional outbursts, and tests. *Id.* Her strengths included her creative ability, enthusiasm, and her computation skills. *Id.* The team also changed the Student's social and behavioral goals to help her deal with her frustration and anxiety. *Id.*

On May 19, 2009, a PPT meeting was held to plan the Student's transition to high school at Cooperative Arts & Humanities ("CO-OP"). B-44. The meeting covered what accommodations would continue while she was in high school and how the staff at CO-OP could be trained and prepared for the Student's transition. *Id.* A second PPT meeting was convened on June 16, 2009 to further discuss what accommodation would be provided at CO-OP and what training would be provided to the staff there. B-45.

In August of 2009, the Parent exchanged emails with CO-OP staff members concerning the Student's scheduled courses, along with several other issues concerning the Student's education. B-47. The Parent was concerned that Spanish and Social Studies had been left off of her daughter's schedule, and that no counseling had been scheduled. *Id.*

The PPT met on October 27, 2009 to discuss further accommodations for testing and to set a goal to encourage increased attendance. B-46. The Parent also agreed to furnish medical documentation to the PPT. *Id.* The Student's attendance goal was set up in monthly stages, and was aimed at achieving 95% attendance. *Id.* On October 29, 2009, the Parent emailed Andrea Sauerbrunn, a school administrator, and noted that the IEP changes should not be implemented and

no district wide assessments should be given to the Student before the Parent could consult the Student's doctors. B-47. The Parent, in this email, and in several prior emails, laid out her frustration with the implementation of the Student's IEP at CO-OP. *Id.*

On November 1, 2009, the Parent emailed the PPT Chair to request help in gathering the Student's possessions from the school and to discuss transferring the Student to a different high school. *Id.* The Parent also noted that the Student would be staying home due to illness, and reiterated her desire to have the Student's assignments submitted by email. *Id.* On November 2, 2009, Dr. Dolores Garcia-Blocker emailed to note that the Student's teachers would not be sending or receiving assignments via email, and that the Student would be marked absent. *Id.* Dr. Garcia-Blocker also noted that paperwork would be filed with "the court" regarding the number of times the Student had been absent from school. *Id.* The Parent responded that the Student was ill, and she had called her daughter in as sick each day that she had missed class. B-47. The Parent continued to note her frustrations with the school's implementation of her daughter's IEP. *Id.* The Parent also alleged that Dr. Garcia-Blocker had thrown a testing booklet at the Student and humiliated the Student in front of her classmates. *Id.* The same day, Patricia Moore, the Student Services Supervisor, responded to several of the Parent's emails to inquire as to whether the Parent was refusing the IEP. *Id.*

A PPT meeting was convened shortly thereafter, on November 5, 2009. B-48. The Parent stated that she was not refusing the IEP, and also brought an attorney to the meeting. *Id.* The PPT meeting was adjourned until the Board could also be represented by counsel. *Id.* Some areas of concern noted at the PPT before the adjournment were the Student's attendance and ability to

complete assignments due to her emotional state. *Id.*

Another PPT meeting was convened on December 22, 2009. B-49. Before the PPT meeting, the Student transferred to High School in the Community (HSC). *Id.* The Student was offered a modified day schedule beginning around 9:30 a.m. *Id.* The Student was also to be provided with social work services when available. *Id.* The Parent agreed to provide more information about the Student's health after a medical consultation at Massachusetts General Hospital. *Id.*

On January 11, 2010, the Student's pediatrician, Dr. Flaherty Hewitt, wrote to HSC to request homebound instruction for the Student. B-50. The note from Dr. Hewitt described her medical history, and included a new movement disorder, which was being investigated by Massachusetts General Hospital. *Id.* The movement disorder was resulting in prolonged periods of blindness, coughing, trouble swallowing, among other serious symptoms. *Id.* The Student was admitted to the Hospital of Saint Raphael in New Haven on January 20, 2010, and was discharged on February 1, 2010. B-53.

The PPT held a meeting on January 26, 2010 with the Board's Counsel. B-54. The Parent requested homebound instruction for the Student. *Id.* She also consented to a Triennial Psychological evaluation of the Student. *Id.* At the meeting, the PPT also discussed the Student's "Present Levels of Academic Achievement and Functional Performance." *Id.* The Student's strengths were identified as her interest and ability and her ability to learn quickly. *Id.* Her weaknesses were identified as the length of lessons, her absenteeism, and her ability to manage stressful situations. *Id.*

The PPT met again on February 23, 2010. B-56. During this meeting, the PPT approved homebound instruction and counseling for the Student. *Id.* The Parent also declined to release the

6

Student's medical records from her hospitalization and from her pediatrician's office. *Id.* Instead, the Parent offered to provide all relevant medical documentation to the PPT. *Id.* The Parent also provided an unsigned "protocol" document regarding the Student's diagnosis of a mitochondrial disease. *Id.* The protocol describes in detail the challenges faced by the Student as a result of this disease, and made specific recommendations for ways that the Student could conserve energy at school or on homebound instruction. *Id.* On April 29, 2010, the Student's pediatrician followed up with the school to note that the Student had success with homebound instruction and to ask that it continue through the summer. B-59. The PPT continued to request that the Parent release the Student's medical records to the school, and the Parent continued to rebuff those requests. B-60. The Parent stated several times that she would pass along any pertinent information, but that she was declining to release the Student's further records. *Id.*

The PPT met again on June 8, 2010. B-65. Both the Parent and the Board had counsel present at the meeting. *Id.* The PPT concluded that homebound instruction would cease at the end of the year, and the Student would be required to return to HSC the following fall. *Id.* The Student's pediatrician's request that she have summer homebound instruction was also denied. *Id.* In order for the Student to continue on homebound instruction for the next fall, the PPT noted that the Parent would have to produce medical documentation. *Id.* The PPT also requested again that the Parent release the Student's records. *Id.*

On August 17, 2010, the Parent submitted a letter from a pediatrician, Dr. Liesel Gould, requesting homebound instruction. B-71. The physician noted that "[i]t would be unsafe for her to be at school without medical supervision." *Id.* Defendant Moore responded to Dr. Gould's letter by

noting that it did not meet the requirements of state regulations because it did not include a diagnosis, a statement of when the Student would likely be cleared to return to school,  and a statement that the Student is medically unable to attend school at the present time. B-72. Ms. Moore noted that the statement that it would be unsafe for the Student to return to school without medical supervision was inadequate because the school has a nurse on staff. *Id.* Ms. Moore further requested that the Parent sign medical release forms for the Student. *Id.*

On September 21, 2010, the PPT met, and again denied homebound placement for the Student. B-77. The Parent signed medical release forms for the Student's pediatrician and her psychiatrist. B-79. The Parent then submitted several letters from physicians requesting homebound services for the Student because of her fatigue. B-87; B-93. On November 9, 2010, the PPT met and approved homebound instruction, including physical therapy, occupational therapy, and assistive technology evaluations.  B-94. The Student received PT and AT evaluations in late January of 2011. *Id.* The PT evaluation noted several areas of concern, including her endurance, mobility, and her sleep pattern. *Id.* The AT evaluation included a list of recommended equipment. *Id.*

These developing facts were intertwined with several statutory due process hearings before the Connecticut IHO concerning the Student's proper placement. The first due process hearing was requested by the Parent on September 29, 2010. B-88. In her request, the Parent asked that the Student be left on homebound services pursuant to the "stay put" provision of Connecticut State Law. *Id.* The IHO was appointed on October 7, 2010, and hearings were held over the course of several months. Final Decision and Order 11-0144, Apr. 20, 2011.

On December 6, 2010, January 19, 2011, and February 9, 2011, another triennial psycho-

8

educational evaluation was performed. B-115. The Student performed at grade level and in the average range for most things, including mathematics calculation and reasoning, written expression, and IQ. *Id.* However, her reading comprehension and fluency and writing skills were in the below average range, and her math skills were "low average." *Id.*

On January 25, 2011, the PPT met to review the PT and OT evaluations. B-109. At this point, the AT and psychological evaluations were not yet completed. *Id.* The PPT continued to approve of homebound instruction and noted that there were concerns with her endurance as it related to her fine and gross motor skills. *Id.*

On March 15, 2011, the PPT met again to review the Student's most recent psycho-educational evaluation, PT consultation, and the AT assessment. B-114.The PPT also heard from the Student's homebound tutor, who reported that the Student was sick six of the twenty-nine days since the last report and had been excused for three days to attend the psycho-educational evaluation. *Id.* The tutor noted ongoing fatigue and endurance issues with the Student. The PPT agreed to allow the Student to continue homebound services. *Id.* Furthermore, the School Nurse summarized Dr. Gould's report noting that the Student has medical issues, potentially due to a mitochondrial deficiency. *Id.*

On March 18, 2011, the Parent emailed a request for an evaluation in reading and writing skills. B-118. The Parent noted that the Student's skills were below average. *Id.* The Parent also requested that Spanish be taught on homebound instruction. *Id.* The Parent further requested that another PPT or two be scheduled to address these issues. *Id.*

The IHO in the first due process hearing rendered a decision on April 20, 2011. Final

Decision and Order, 11-0144, Apr. 20, 2011. The decision and order held that the disagreement over homebound placement was moot because the PPT ultimately agreed to the placement; that the Student was entitled to Spanish instruction on homebound placement; and that the Board should create an extended year placement for 2011 to make up for the missed Spanish instruction. *Id.* Furthermore, the IHO held that the PPT must consult with the Student's pediatrician regarding further homebound instruction, must consider the Student's testing accommodations at each PPT, and must explore options to connect the Student to one class electronically. *Id.* The IHO found the issues related to AT, OT, and PT moot, because of the recent evaluations and the provision of the equipment that was recommended. *Id.* Additionally, the IHO found that the Student's IEP at the time was sufficient. *Id.*

In May 2011, the Student changed pediatricians from Dr. Gould to Dr. Maddox, who had previously been her pediatrician in Spring 2009 through Spring 2010. B-125. Referring to a report prepared by Dr. Gould, the School Nurse summarized the Student's health status the on March 17, 2011. B-133. The Nurse noted eleven physicians involved with the Student's care, either as primary physicians or consulting physicians. *Id.* Also noted were eight allergies, eight medications, and six supplements for the Student. *Id.* The nurse noted that some physicians had expressed concerns of polypharmacy,[2] which could have contributed to the Student's symptoms. *Id.* The Student's pediatrician also agreed to provide the school with the results of the various consultations that were scheduled for the Student. *Id.*

---

[2] Polypharmacy is defined as taking five or more drugs concurrently. *See* The Dangers of 'Polypharmacy,' the Ever-Mounting Pile of Pills, NY TIMES, April 22, 2016, *available at* http://www.nytimes.com/2016/04/26/health/the-dangers-of-polypharmacy-the-ever-mounting-pile-of-pills.html.

On May 26, 2011, the AT Consultant visited the Student in her home for a training and consultation. B-136. During the consultation, the AT Consultant found that the previously installed voice-recognition software was not receiving and processing audio correctly. *Id.* The AT consultant attempted to troubleshoot the laptop, and ultimately, it was sent to IT for repairs. *Id.*

The PPT met on May 31, 2011, to discuss and implement the decision of the IHO in the first due process hearing. B-139. The PPT agreed to continue the IEP from the March 31, 2011 PPT until June 24, 2011, and to provide an extended school year for Spanish through June 6, 2011. *Id.* The PPT also provided door-to-door transportation. *Id.* The next PPT meeting was scheduled for September 6, 2011 to revise the IEP. *Id.* At the PPT meeting, the Parent again requested reading assessments because the Student's reading was below average. *Id.* The Board denied the request, citing the results from the psychoeducational evaluation as sufficient. *Id.*

After the May 31 PPT, Dr. Maddox wrote a letter to the school's medical department regarding the Student's physical limitations for Summer school. B-141. Dr. Maddox supported the Student returning to school for a portion of the day, provided that she did not have to exert herself too much, and that she was allowed rest time during the school day. *Id.*

On July 6, 2011, the Board requested a due process hearing on several issues. B-145. The first and second issues were whether the Board was entitled to an order allowing the Board to proceed with a medical and a psychiatric evaluation of the Student by physicians designated by the Board. *Id.* The third issue was whether the academic achievement evaluation conducted by the Board was appropriate to assess the Student's reading skills. *Id.* The fourth and final issue posed this question:  If the Board's achievement evaluation was not appropriate, was the Parent entitled to an

independent reading evaluation at public expense. *Id.*

The Student attended a summer program for Spanish during the summer of 2011. B-150. She attended the summer school program for eleven days, and was successful in keeping her stamina and energy levels up in order to take advantage of the program. *Id.*

In July and August, 2011, the Parent had Miriam Cherkes-Julkowski, Ph.D. evaluate the Student. B-152. Dr. Cherkes-Julkowski's educational evaluation found greater deficits in the Student's abilities than the psychoeducational evaluation done by the school. *Id.* After extensive testing, Dr. Cherkes-Julkowski recommended that the Student be put into a "total school environment" which would allow her to learn at her own pace with peers who face similar challenges. *Id.* She also recommended that teaching focus on the Student's understanding of the material, rather than repeated drilling of the material. Dr. Cherkes-Julkowski also focused on the Student's reading deficits, suggesting a tailored reading program to help the Student overcome her visiospatial and phonological problems. *Id.* Additionally, she recommended a tailored program to help the Student with reading comprehension and mathematics, including more AT support. *Id.*

The Student attended school on the first day of the new school year, September 1, 2011. Hearing Tr., Lauren Evanovich, Feb. 8, 2012.  However, she did not attend the following day. *Id.* On September 6, 2011, the PPT met to revise the Student's IEP. B-157. The PPT recommended that the Student return to a full day program at the school. *Id.* This was based on a letter from the Student's physician, Dr. Maddox, who recommended that she return to a full day with several accommodations, including access to food should the Student feel weak, a low-protein diet, and extra time to reach her classes. *Id.* The PPT recommended that the Student receive "research based reading

instruction, that the nurse develop a health care plan, and that door-to-door transportation be provided." *Id.* Furthermore, the PPT planned that the Student would receive 3.5 hours of direct reading instruction, 7 hours of resource support (including pre-teaching), 3.5 hours of support in U.S. History II, and .5 hours of social work support per week. *Id.* Additionally, the Student was scheduled to have 5 hours per month of PT, OT, and AT. *Id.*

The next PPT was scheduled for the week of October 3, 2011 to assess progress. B-157. The PPT recommended that the Student use Read 180 and Lexia Learning software to aid in reaching her reading goals. *Id.* During this PPT, Dr. Cherkes-Julkowski was given time to review her report. *Id.* Additionally, the director of Easton Country Day School, a private school focused on students with disabilities, was present but did not speak during the meeting. *Id.* During the meeting, the Student presented a PowerPoint presentation about her experience in the school system. Hearing Tr., Lauren Evanovich, Feb. 8, 2012; B-158. However, she could not finish her presentation because she became upset and began to cry. *Id.* At no time during the meeting did the Parent request placement at Easton Country Day School; however, the Parent did object to the Student's program because she felt the Student was unsafe at school and because she was concerned that there was only a nurse at the school one day a week. *Id.*

On September 7, 2011, the Board withdrew its due process hearing request, filed on July 6, 2011, because additional medical information was made available by the parent, and an IEP was developed. B-159. After the PPT, the Student attended school on September 7, 2011, and was provided curriculum based assessments to determine her placements. Hearing Tr., Lauren Evanovich, Feb. 8, 2012. Her math assessment placed her in Algebra I or higher, and her reading assessment

put her reading at the level of a ninth grader. *Id.* The Student performed better on these assessments than she did on the evaluation performed by Dr. Cherkes-Julkowski. *Id.*

On September 11, 2011, the Parent notified the Board's supervisor that the Student would be visiting Easton Country Day that week. B-160. The Parent noted that the Student was visiting the private school because she was not safe in the public school system. *Id.* On September 25, 2011, the Parent requested a third due process hearing, which resulted in the decision at issue in this case. B-166. After requesting the hearing, the Student was assessed by a speech and language pathologist, Meryl Aronin, who noted a written and oral expression language disorder. P-24. Thereafter, the Student attended at Easton Country Day, where she was attending school two or three days a week. Hearing Tr., Nancy Genn, Jan. 20, 2012.

Over several months, the IHO held nine hearings regarding several issues identified for the due process hearing. Final Decision and Order 12-0117, Apr. 9, 2012. The issues included whether the Board's proposed program for the Student for the 2011–2012 school year was appropriate, and if not, whether the Student's placement at Easton Country Day was appropriate and should be reimbursed; whether the board should pay for the Student's transportation to Easton Country Day, her OT, PT, and reading specialist, and the independent educational evaluation done by Dr. Cherkes-Julkowski. *Id.* Finally, the IHO also looked at the issues of whether the Parent was permitted to participate in the September 6, 2011 PPT meeting, whether the Student should be provided an auditory processing evaluation, whether the Student should be provided an AT re-evaluation, and whether the Student was entitled to compensatory education. *Id.* At the hearing, Chris Quirk, the director of ECDS, Shelley Lacey-Castelot, a reading specialist, Meryl Aronin, a speech pathologist,

Dr. Theodore Zanker, the Student's psychiatrist, and Nancy Genn, the parent, testified on behalf of the Parent. *Id.* Kimberly Hartmann, an AT consultant, Laura Evangelist, an occupational therapist, Lauren Evanovich, a special education teacher at HSC, Jeffrey Lowell, a school psychologist, Diane Henley, a speech and language pathologist, and Patricia Moore, a supervisor of school services, testified on behalf of the Board. *Id.*

The IHO, in her Final Decision and Order, held that the Board's program for the Student during the 2011-2012 school year was appropriate, and that the Parent was not entitled to reimbursement for the Student's placement at Easton Country Day School, the cost of transportation to Easton Country Day, and the costs of reading, OT, and PT specialists. Final Decision and Order 12-0117, Apr. 9, 2012. Furthermore, the IHO held that the Parent would not be reimbursed for the independent educational evaluation performed by Dr. Cherkes-Julkowski or the speech and language evaluation performed by Meryl Aronin. *Id.* The IHO also found that the parent was allowed to participate in the September 6, 2011 PPT meeting, and that the Board did not commit procedural violations related to that meeting. *Id.* Additionally, the IHO found that the Student was not entitled to an auditory processing evaluation, an AT re-evaluation, or a compensatory education. *Id.* Finally, the IHO ordered visual scanning and audiological/hearing assessments, and also overrode any lack of parental consent to those assessments. *Id.*

## II.  STANDARD OF REVIEW

Rule 56(a) of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under this standard,

"the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby*, 477 U.S. 242, 247–48 (1986). The burden of proof regarding the absence of any genuine issues of material fact rests with the moving party. *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010) (*citing Rodriguez v. City of New York*, 72 F.3d 1051, 1060–61 (2d Cir. 1995)). Finally, summary judgment is only proper where no reasonable inference could be drawn in favor of the nonmoving party from the evidence in the record. *Vivenzio*, 611 F.3d at 106 (*citing Howley v. Town of Stratford*, 217 F.3d 141, 151 (2d Cir. 2000)) ("It is not the province of the court itself to decide what inferences should be drawn.") Additionally, a moving party "may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case." *Gallo v. Prudential Residential Services, Ltd. Partnership*, 22 F.3d 1219, 1223–24 (2d Cir. 1994).

IDEA appeals are frequently resolved by cross-motions designated as motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  However,

> Though the parties in an IDEA action may call the procedure 'a motion for summary judgment,' the procedure is in substance an appeal from an administrative determination, not a summary judgment motion. . . .  Basing its decision on the preponderance of the evidence, the court is required to grant such relief as the court determines is appropriate.

*M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 226 (2d Cir. 2012) (internal quotations, citations, and alterations omitted).  The "preponderance of the evidence" standard comes directly from the IDEA itself.  20 U.S.C. § 1415(i)(2)(C) ("basing its decision on the preponderance of the evidence, [the district court] shall grant such relief as the court determines is appropriate").  Accordingly, "'a motion

for summary judgment in an IDEA case often triggers more than an inquiry into possible disputed

issues of fact.  Rather, the motion serves a pragmatic procedural mechanism for reviewing a state's

compliance with the procedures set forth in [the] IDEA.'" *M.H.*, 685 F.3d at 225–26 (quoting

*Lillback ex rel. Mauclaire v. State of Conn. Dep't of Educ.*, 397 F.3d 77, 83 n.3 (2d Cir. 2005)).

Finally, in determining whether a state agency's decision as to a local education agency's

compliance with the IDEA is supported by a preponderance of the evidence, the court should keep

in mind that

> '[t]he role of the federal courts in reviewing state educational
> decisions under the IDEA is circumscribed.' *Gagliardo v. Arlington
> Cent. Sch. Dist.*, 489 F.3d 105, 112-13 (2d Cir. 2007) (internal
> quotation marks omitted).  The standard of review 'requires a more
> critical appraisal of the agency determination than clear-error review
> but nevertheless falls well short of complete *de novo* review.' *M.H.
> v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 244 (2d Cir. 2012) (internal
> quotation marks, ellipses, and brackets omitted).  The deference owed
> depends on both the quality of the opinion and the court's institutional
> competence. *Id.*

*C.F. ex rel. R.F. v. N.Y.C. Dep't of Educ.*, 746 F.3d 68, 77 (2d Cir. 2014).

## III.  DISCUSSION

The parties in the case at bar purported to file their motions in accordance with Rule 56

practice as described in the Federal Rules and the Local Rule of this Court.  Part III.A. of this Ruling

adopts that approach.

A.     **Procedural Deficiencies in Plaintiff's Motion for Summary Judgment**

Plaintiff Nanycy Genn failed to file a Local Rule 56(a)(1) statement together with her self-

styled Motion for Summary Judgment.  According to the District of Connecticut's Local Rules of

Civil Procedure, "[t]here shall be annexed to a motion for summary judgment a document entitled

'Local Rule 56(a)(1) Statement,' which sets forth in separately numbered paragraphs . . . a concise statement of each material fact as to which the moving party contends there is no issue to be tried." LOC. R. CIV. P. 56(a)(1).  Defendants request that the Court deny the Plaintiff's Motion for Summary Judgment on this basis.

"A district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001).  The Court will not deny the Plaintiff's Motion for Summary Judgment because of this deficiency, nor will the Court consider all facts submitted by Defendants to be undisputed, given that the Plaintiff did file a Local Rule 56(a)(2) statement in response to Defendants' Rule 56(a)(1) statement.

## B.    **Alleged Bias of the Independent Hearing Officer**

Plaintiff alleges that the Independent Hearing Officer was biased against her and her attorney. The IDEA provides that "the parents . . . shall have an opportunity [following a complaint] for an impartial due process hearing. . . ."  20 U.S.C. 1415(f).  Additionally "A hearing officer . . . shall, at a minimum . . . possess the knowledge and ability to conduct hearings in accordance with appropriate, standard legal practice." 20 U.S.C. 1415(f)(3)(A)(iii).  Connecticut law provides that "[t]he hearing officer shall take reasonable measures, including the exclusion from the hearing of parties, counsel, or any other participant, to ensure that the parties, counsel and all other participants comport themselves civilly and that the hearing is conducted in a fair and orderly manner." Conn. Gen. Stat. § 10-76h(d)(1).

Throughout the hearing, the hearing officer made comments regarding the comportment of

the Plaintiff, the Plaintiff's daughter, and the attorney for the Plaintiff.[3] At one point during the hearing, the Plaintiff's attorney requested that the independent hearing officer recuse herself, which she declined to do.[4] Plaintiff asserts that the hearing officer was biased in favor of the Board of Education. In the IHO's Final Decision and Order, the IHO commented on the conduct of the Parent and counsel, stating

> From the first day of the hearing, continuing throughout the course of the hearing, counsel for the Parent and the Parent were disrespectful to the hearing officer and to the proceedings. Counsel and the Parent would make outbursts and asides as well as comment after rulings were made by the hearing officer. The Parent also mocked the process, refusing to answer yes and no questions, and repeatedly responding with uh huh and ah huh rather than yes or no. When the Board counsel asked why she was having difficulty responding to the questions, the Parent sarcastically responded that she had a medical condition that prohibited her from answering questions called "yes-ism." The disrespectful and unprofessional conduct unnecessarily prolonged the hearing.

Final Decision and Order 12-0117, p. 2 n. 1.

---

[3] *See, e.g.,* Hearing Transcript, November 29, 2011, p. 9, lines 20-22( IHO tells Plaintiff "No, no. You have counsel speak for you, so you have to have counsel only speaking."); p. 15, lines 9-10 (IHO tells Plaintiff's counsel "I don't need you to make a speech right now."); p. 16, lines 23-24 (IHO tells Plaintiff's counsel "You keep addressing me as a colleague. I'm the Hearing officer."); p. 17, lines 4-20 (Plaintiff's counsel: "That [notice of appearance] will be filed before lunch. Thank you", IHO: "But I'm not the one you're – you should be arguing with.", Plaintiff's counsel: "I'm not arguing, I'm trying to–", IHO: "Yes, you are. You just did it again.", Plaintiff's counsel: "Okay", IHO: "Alright?", Plaintiff's Counsel: "I'll keep a smile on today.", IHO: "And an inappropriate aside is not appropriate either. It apparently is your first special education hearing. I don't know if it's your first hearing, but you don't make comments when I give you direction, okay?").

[4] On February 2, 2012, counsel for the Plaintiff stated: "I'd like to enter a motion to recuse the Hearing officer for an abusive [sic] discretion, for arbitrary and capricious decisions that are clearly biased against my client." Hearing Transcript, February 2, 2012, p. 7, lines 1-4 (statement of attorney Rose Longo-Mclean). The IHO responded: "Oh, motion denied. That's a bit absurd. I have given actually your client every bit of patience that I can...." Hearing Transcript, February 2, 2012, p. 7, lines 5-7.

The IHO is required to conduct the hearing in a fair and orderly manner. The transcript demonstrates repeated attempts to get Plaintiff, Plaintiff's daughter, and the attorney for the Plaintiff to respect the proceeding. The Court was not present at the hearing, and thus is limited in its ability to judge the necessity of the IHO's decision to make repeated comments regarding the behavior of the Plaintiff, her daughter, and her counsel. While the IHO's conduct at times strikes the Court as unnecessarily curt and harsh, the Court is neither convinced that this behavior so affected Plaintiff's case that the outcome would have been different with another IHO, nor that it rendered the process biased.

C.      **Was the Student Provided a Free and Appropriate Public Education?**

Plaintiff states, in her motion for summary judgment, that the Student was denied a free and appropriate public education ("FAPE"). Specifically, in the Complaint, the Plaintiff alleges that the Student was denied a FAPE because the Parent was not permitted to participate in the September 6, 2011 PPT meeting. Complaint, ¶ 20. However, Plaintiff provides very little argument or case law to support this assertion. The Defendants, on the other hand, argue that the IHO was correct in concluding that the Student was provided a FAPE.

"A state receiving federal funds under the IDEA must provide disabled children with a free and appropriate public education." *R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 174-75 (2d Cir. 2012); 34 C.F.R. § 300.101(a) (a FAPE "must be available to all children residing in the State between the ages of 3 and 21"). A "centerpiece" of the provision of a FAPE is "'the individualized education program,' or 'IEP.'" *Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ.*, 297 F.3d 195, 197 (2d Cir. 2002) (quoting *Honig v. Doe*, 484 U.S. 305, 311 (1988)); *see also R.E.*, 694 F.3d at 186

("the adequacy of the IEP . . . creates considerable reliance interests for the parents"). An IEP "is a written statement that sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." *M.H.*, 685 F.3d at 224.

In order to determine whether a student has been provided a FAPE, the court engages in a two step analysis. First, the court must determine whether the "state complied with the procedures set forth in the act." *Board of Education of Hendrick Hudson Central School District v. Rowley*, 458 U.S. 176, 206 (1982). A procedural violation under the IDEA can be found only where "the procedural inadequacies (i) impeded the child's right to a free appropriate public education; (ii) significantly impeded the parent's opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child; or (iii) caused a deprivation of educational benefits." 20 U.S.C. §1415(f)(3)(E)(ii). Second, the court must assess whether the IEP was "reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 206–07.

1.  **Compliance with the IDEA's Procedural Requirements**

The IHO applied the correct standard from *Board of Education of Hendrick Hudson Central School District v. Rowley*, 458 U.S. 176 (1982), when deciding whether the Student was provided a FAPE. The IHO first looked at whether the procedures of the IDEA had been followed by the school district. She found the correct procedures had been followed. The Parent claimed that she was not allowed to participate in the September 6, 2011 PPT meeting, but the IHO concluded that this was unfounded. The IHO found that the Parent, the Student, and the Parent's expert, Dr. Miriam

Cherkes-Julkowski, were all allowed to speak at the meeting. In addition, the evidence indicates that the Parent's expert consultant presented for over a half-hour. There is no evidence that the Parent was denied the opportunity to speak at the meeting.

The Plaintiff additionally argues that there were procedural deficiencies in the PPT meeting on September 6, 2011 because over twenty people attended the meeting, when the notice listed only ten. This, in itself, is insufficient to establish a procedural violation of the IDEA because it does not impede the child's right to a free appropriate education, it does not impede the parent's opportunity to participate in the decisionmaking process, and it does not cause a deprivation of educational benefits. The Plaintiff also argues that the September 6, 2011 meeting was convened to discuss the Student's placement at ECDS, and the plan in place for the Student at ECDS, and this could not be done because the board representatives spoke over the Parent and Chris Quirk. In her testimony, Nancy Genn said that when she tried to introduce Chris Quirk to present on the ECDS program, she was told that they had to listen to one of the board representatives read a report. Hearing Transcript, January 20, 2012, p. 53. However, Chris Quirk's testimony contradicts that of Nancy Genn. Chris Quirk said that the Parent did not, to his recollection, attempt to introduce him to make a presentation, though that was his understanding as to why he was there. Hearing Testimony, November 29, 2011, p. 155–57. He said that no one stopped him from presenting, but he ran out of time and had to leave the PPT meeting. *Id.* He left the Parent with a paper copy of the proposal. *Id.*

The Plaintiff further asserts that the IHO relied only on the testimony of the Board Supervisor, Patricia Moore, in reaching the conclusion that the parent was allowed to participate in the PPT, and that this evidence is self-serving. Patricia Moore testified that the Student was

permitted to present to the PPT on September 6, 2011. Hearing Transcript, March 5, 2012, p. 109–10. She also testified that Chris Quirk, the Director of ECDS and guest of the Parent, spoke at various times during the PPT. *Id.* at 111–12. Finally, Patricia Moore noted that the Parent spoke during the meeting. *Id.* at 114. The fact that testimony is self-serving does not render it useless to the Court. Were it otherwise, courts could rarely rely upon any evidence offered by either side in a litigated matter.

Additionally, the IHO relied on significantly more evidence than just Patricia Moore's testimony. For example, the IHO also relied on the testimony of the Director of Easton Country Day School, Chris Quirk, who testified that Dr. Cherkes-Julkowski spoke for approximately half an hour at the September 6, 2011 PPT meeting. Hearing Transcript, November 29, 2011, p. 153–54. Mr. Quirk also testified that he was allowed to speak, and made several statements, but did not present on Easton Country Day. *Id.* at 155. He also submitted a paper copy of a proposal for the Student's placement at ECDS. *Id.* The IHO also relied on the PPT meeting minutes, which stated that the PPT meeting was convened to revise the Student's IEP and to review Dr. Cherkes-Julkowski's report, and that Dr. Cherkes-Julkowski was permitted to present her findings. Board Exhibit 157, p. 2. Furthermore, the PPT meeting minutes noted that the Parent presented two letters from a doctor to the committee, requested that she be reimbursed for Dr. Cherkes-Julkowski's independent educational evaluation, and that the Student presented on her frustrations with her educational experience. *Id.* There is no evidence that the Parent disagreed with these aspects of the meeting minutes. There is no evidence that the Student was denied any procedural safeguard guaranteed to her by the IDEA.

2.       **Substantive Adequacy of the Student's IEP**

In order to determine whether the Student was provided a FAPE, the Court must next assess whether the "individualized educational program developed through the Act's procedures [is] reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 206–07. However, the "IDEA does not require states to develop IEPs that maximize the potential of handicapped children. What the statute guarantees is an appropriate education, not one that provides everything that might be thought desirable by loving parents." *Walczak v. Florida Union Free Sch. Dist.*, 142 F.3d 119, 132 (2d Cir. 1998) (internal quotations omitted). A school district "need not provide the optimal level of services, or even a level that would confer additional benefits, since the IEP required by IDEA represents only a 'basic floor of opportunity.'" *Carlisle Area School v. Scott P.*, 62 F.3d 520, 533 (3d Cir. 1995) (*quoting Rowley*, 458 U.S. at 201). A state satisfies its burden under the IDEA where it "provid[es] personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction." *Rowley*, 458 U.S. at 203. The IEP must "be formulated in accordance with the requirements of the Act and, if the child is being educated in the regular classrooms of the public education system, should be reasonably calculated to enable the child to achieve passing marks and advance from grade to grade." *Id.* at 203–04. Thus, and IEP must be "likely to produce progress, not regression" and provide the Student with more than mere "trivial advancement." *Cerra v. Pawling Cent. School Dist.*, 427 F.3d 186, 195 (2d Cir. 2005) (*quoting Walczack*, 142 F.3d at 130).

"Because administrative agencies have special expertise in making judgments concerning student progress, deference is particularly important when assessing an IEP's substantive adequacy."

*Cerra*, 427 F.3d at195. The Court, "in order to avoid 'impermissibly meddling in state educational methodology' . . . 'must examine the record for any objective evidence indicating whether the child is likely to make progress or regress under the proposed plan.'" *Id.* (*quoting Mrs. B v. Midlford Bd. Of Educ.*, 103 F.3d 1114 (2d Cir. 1997)). In the case at bar, the IHO found:

> [t]he Board's proposed IEP for the Student includes appropriate goals and objectives that address the Student's demonstrated weaknesses, including weaknesses in math and reading noted on the psychoeducational evaluation, providing education utilizing scientifically research based interventions and appropriate related services in the area of AT, OT and PT, as well as a health plan to address any current issues that may arise or need to be addressed in the school setting.

Final Decision and Order 12-0117, Apr. 9, 2012, p. 14. Furthermore, though the Student had health issues, the Student's physician suggested that she could attend a full day of school and did not note any requirement that a school nurse be available at all times. *Id.* These holdings are all supported by evidence from the record.

Plaintiff asserts that the IHO's finding that the proposed IEP was appropriate for the Student was wrong because it failed to account for her dyslexia, which resulted in weak phonological and decoding abilities. However, Plaintiff acknowledges that reading goals and objectives were added to the Student's IEP after the Board reviewed Dr. Cherkes-Julkowski's report. Plaintiff argues that the Board provided no evidence that the proposed programs, Read 180 and Lexia, were appropriate for the Student. Shelley Lacey-Castelot, a reading consultant used by the Parent, testified that she did not think that Lexia was the right program for the Student because it would not help her phonological deficiencies. Hearing Testimony, December 16, 2011, pp. 19–26. She did not have enough personal knowledge of Read 180 to speak to its efficacy for the Student, though she noted that her research indicated it had a low efficacy rate. *Id.*

25

Plaintiff also argues that the Board "intentionally misreport[ed] important test results" related to the Student's learning. Plaintiff's Motion for Summary Judgment, p. 3. Daniel Cotton, the certified school psychologist who performed the Student's psycho-educational evaluation for the school district, concluded that the Student's reading comprehension and fluency skills were below average. However, the PPT notes recorded that the Student's reading skills were in the "low average" range, rather than "below average." There is no evidence that the Board intentionally misrepresented the Student's scores, and that it was anything more than an inadvertent error. Furthermore, reading goals were added to the Student's IEP, indicating that the Board recognized that the Student was struggling with reading.

Additionally, the Student was found to have average decoding skills by Daniel Cotton, which does not align with Dr. Cherkes-Julkowski's report. While the reports, one from Daniel Cotton and one from Dr. Cherkes-Julkowski, differed, the Board was required only to consider them both when formulating the Student's IEP under the Connecticut Regulations. Conn. Bd. Of Educ. Reg. § 10-76d-9(c)(3) ("If the parents obtain an independent evaluation at private expense, the results of the evaluation must be considered by the board of education in any decision concerning the provision of a [FAPE]"). "Notably, there is no provision in the regulations requiring that a school board accept the recommendations of an independent evaluation or that the evaluation be accorded any particular weight." *T.S. v. Ridgefield Bd. of Educ.*, 808 F. Supp. 926, 931 (D. Conn. 1992), aff'd sub nom. *T.S. v. Bd. of Educ. of Town of Ridgefield,* 10 F.3d 87 (2d Cir. 1993). Additionally, the federal regulations explicitly detail what process is owed to Parents with regards to independent evaluations, but do not require that the evaluation be given any particular weight. *See* 34 C.F.R. § 300.533 and § 300.344.

26

The Board listened to a summary of the report at the PPT meeting for approximately thirty minutes. The Court finds that the Board considered the report as required by the Connecticut and Federal regulations. Given that the Board was faced with conflicting reports, the IEP is not invalidated by the PPT giving more weight to one report over another, particularly because the PPT did add reading and decoding goals to the Student's IEP. The Parent, under the IDEA, is not entitled to have the state develop an IEP that would maximize the Student's potential, but rather one that is likely to produce an educational benefit to the Student. *See Walczak*, 142 F.3d at 132. Though the Parent would have preferred a different type of reading intervention, the Court finds that this aspect of the IEP was sufficient to address the Student's deficiencies. Accordingly, the Court concludes that the Student was provided an IEP, and coupled with the Court's findings regarding the IDEA procedure, the Court also concludes that the Student was provided a FAPE.

D.    **Entitlement to an Assistive Technology Reevaluation**

Plaintiff argues briefly in her Motion for Summary Judgment that the IHO improperly concluded that the defendants had provided the Student with the appropriate modifications and accommodations recommended by the AT consultant, in direct contravention to the record. The Plaintiff provided no citations or argument to support this argument. Defendants argue that the Student met several times with AT consultants and the school system provided all of the AT accommodations to the Student that were suggested.  Defendants also argue that any AT issues that the Student may have faced before the 2011–2012 school year were outside the scope of the hearing, and hence the appeal to this Court.[5]

---

[5] Defendants assert that because the IHO decided, in the Board's Partial Motion to Dismiss, that the hearing was limited to the 2011–2012 school year, this Court is also bound by

What the record demonstrates is that the Student felt frequently frustrated by her struggle to get access to the AT that she required pursuant to her IEP. Though she was assessed appropriately, the school board failed to provide, in a timely manner, working technology to aid the Student. The Parent, at every turn, had to consistently pursue the PPT team to get the titles of the books that would be assigned to the Student in order to get books on tape, to get a working laptop and dictation program, and to gain access to other recommended AT, particularly in the past school years, prior to 2011.

However, by the 2011–2012 school year, it appears that the Student was given a thorough AT evaluation, and that the IEP appropriately included AT goals for the Student. Without any argument from the Plaintiff to the contrary beyond a conclusory statement the AT evaluation provided was insufficient, the Court is not persuaded that this is a valid reason to find that the Student was denied a FAPE for the 2011–2012 school year or that she was entitled to an AT reevaluation.

E.     **Independent Educational Evaluation**

The Plaintiff asserts that the IHO was incorrect in concluding that the Board did not have to bear the cost of Dr. Cherkes-Julkowski's independent educational evaluation ("IEE") and Meryl

---

that judgment under the law of the case doctrine. The law of the case doctrine provides that "when a court has ruled on an issue, that decision should generally be adhered to *by that court* in subsequent stages in the same case . . . unless 'cogent' and 'compelling' reasons militate otherwise." *United States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002) (*citing United States v. Tenzer*, 213 F.3d 34, 39–40 (2d Cir. 2000)) (emphasis added). However, this Court is not the same court to have made the ruling at issue, instead, this is the reviewing court. This District Court is not bound by the law of the case that was decided by the IHO. However, the holding of the Motion to Dismiss, as discussed infra, is not a part of this appeal, and so the Court declines to extend the scope of the hearing with regards to assistive technology.

Aronin's speech and language evaluations. "[A] parent has the right to an independent educational evaluation at public expense if the parent disagrees with an evaluation obtained by the public agency." 34 C.F.R. § 300.502(b)(1); *see also* Conn. Agencies Regs. § 10–76d–9(c)(2) ("Parents have the right to an independent evaluation at public expense if the parents disagree with an evaluation obtained by the board of education.").

1.   **Dr. Cherkes-Julkowski's Independent Educational Evaluation**

The IHO concluded that the Parent did not object to the Board's educational evaluation, and thus was not entitled to compensation for the IEE. At most, the Board argues, the Parent was seeking a more in-depth analysis of the Student's reading weaknesses identified in School Psychologist Daniel Cotton's psycho-educational evaluation from March 2011. The Parent asserts that she disagreed with the Board's evaluation. Furthermore, the Parent argues that because the Board misrepresented the reading results of its own psycho-educational evaluation as low average instead of below average in the PPT meeting, that the Parent is entitled to the costs of the evaluation.

The minutes from the PPT meeting on May 31, 2011 did not include the Parent's request for an independent educational evaluation initially; however, the minutes were later revised at the Parent's request to note that she did request an independent evaluation. The accompanying notes provide "Team reviewed the psycho-educational assessment and found sufficient information to address appropriate goals in area of reading. Mom said she did not disagree with assessments." B-140. On this basis, the Board refused the Parent's request for an IEE.

The Parent, in her testimony, indicated that she did not know why the PPT notes indicated that she did not disagree with the assessments because she in fact disagreed. To read the note on the

PPT minutes that the parent did not disagree with the assessments as precluding a finding to the contrary would be overly formalistic. The question of whether the Parent disagreed is a factual question that is reserved to the IHO, and in this case, subject to review by this Court.

While the Court is wary of substituting its own judgment for that of an IHO who has significant experience with educational issues, the Court is not persuaded that the IHO's holding on this question is correct. The IHO found that the parent "seemed to be seeking a more in-depth analysis of the assessments completed by the Board." Final Decision and Order 12-01117, p. 15. However, the Court is not persuaded that a parent must announce in a formalistic manner, "I, Parent, disagree with this assessment!" to be found to have disagreed in substance with the assessment. The Parent testified before the IHO that she disagreed with the assessment because the reading tests given were not sensitive enough to pick up the phonological awareness issues which the Student faced. Hearing Transcript, January 20, 2012, p. 40–41. This reasoning as to why the Parent requested an IEE is sufficient to find that she disagreed with the assessment given by Daniel Cotton. In the IHO's own words, seeking a more in-depth analysis of the assessments given by the Board could be, and in this case is, sufficient to indicate disagreement with the Board's evaluation where the Parent sought the more in-depth analysis because she felt the assessment was not sufficient to identify the Student's reading difficulties. In substance, the Parent did disagree with the assessment. She provided more than just a generalized request for more information, as she provided a specific reason why the assessment was not sensitive enough to detect the Student's reading deficiencies.

Moreover, the Board did not follow through on requesting a due process hearing to adjudicate the question of the IEE. Under the relevant regulations, if a Parent requests an IEE, the Board must

either "file a due process complaint to request a hearing to show that its evaluation is appropriate; or [e]nsure that an independent educational evaluation is provided at public expense . . . ." 34 C.F.R. § 300.502(b)(2). In this case, the Board filed a due process complaint to request a hearing on two issues, one of which concerned the IEE request denied by the Board. The Board then dropped the due process complaint when the Parent addressed the other issue in the hearing, having to do with medical evaluations. Thereafter, the Board maintained that the Parent had not "disagreed" with the school's assessment, though the Board initially treated the request as though the Parent had disagreed. The Court finds that the IHO erred in holding that the Parent is not entitled to reimbursement for the IEE conducted by Dr. Cherkes-Julkowski because the IHO incorrectly concluded that the parent did not disagree with the Board's evaluation.Therefore, the Parent is entitled to reimbursement for the IEE.

2.    **Meryl Aronin's Speech and Language Evaluation**

The Board argues that because it "was not permitted" to conduct its own speech and language evaluation prior to the Parent obtaining her own evaluation, the IHO properly concluded that the Parent was not entitled to reimbursement for the speech and language evaluation. To the extent that the Parent is seeking reimbursement for the speech and language evaluation, it is denied. The Board must be afforded the opportunity to conduct the initial evaluation with professionals satisfactory to the school before the Parent may disagree and request an independent evaluation. *See* 34 C.F.R. § 300.502(b)(1); *see also Dubois v. Connecticut State Board of Educ.*, 727 F.2d 44, 48 (2d Cir. 1984). Here, the Board was not afforded that opportunity. The IHO was correct in holding that the Parent should not be reimbursed for the speech and language evaluation.

31

F.   **Compensatory Education**

The Plaintiff argues that the IHO incorrectly held that the Plaintiff was not entitled to compensatory education. A finding of compensatory education would require the Board to provide a child with an appropriate education to remedy the denial of a FAPE. *Mrs. C. v. Wheaton*, 916 F.2d 69, 75–76 (2d Cir. 1990). Additionally, because the Student is now over the age of 21, the Plaintiffs would have to demonstrate a gross violation of the IDEA. *Id.* The Court concluded supra, in Section III(C), that the Student was not denied a FAPE. Thus, the Student is not entitled to a compensatory education for the 2011–2012 school year.

The Plaintiff also appears to argue that she is entitled to compensatory education for the 2010–2011 school year. Plaintiff argues that she could not have raised the question of compensatory education in the first due process hearing before IHO Gelfman because she could not have known that she had a claim until Dr. Cherkes-Julkowski's evaluation showed the Student's regression. The Board argues that, because the Plaintiff could have raised the issue of compensatory education for the 2010–2011 school year in the first due process hearing, *res judicata* bars the Plaintiff from bringing the claim now because it could have been raised in a prior hearing.

Defendants raise a series of frivolous arguments regarding the 2010–2011 school year. Defendants assert that any compensatory education claims related to the 2010–2011 school year are barred by the law of the case doctrine. As discussed above, the law of the case does not apply to a reviewing court, and thus is inapplicable to the case at hand. Additionally, Defendants seem to argue that because the statute of limitations for initiating a due process hearing is two years, the 2010–2011 school year was barred because it was raised first in the due process hearing requested in September

32

of 2011, and "only claims from the last two years can be heard in a due process hearing and further proceedings." The claims are not barred by the statute of limitations, as they were raised, and subsequently dismissed, before the statute of limitations expired. The dismissal of the claims is partially the subject of this appeal.

The question can be resolved much more simply. The Complaint before this Court does not allege that the hearing officer improperly decided the Board's motion to dismiss. The question is not properly before this Court regarding whether or not the decision to limit the due process hearing to the 2011–2012 school year was appropriate. The Complaint challenges only the final decision of the hearing officer. Though the Complaint requests compensatory education for the period of 2004 to 2011, this goes beyond the scope of the due process hearing, and thus the limited review that this Court is required to do.

G.    **Weight of the Evidence**

In the Complaint, the Plaintiff alleges that the hearing officer failed to consider testimony offered on behalf of the Parent and improperly drew conclusions that misconstrued the testimony. Generalized complaints about the weight afforded to the evidence by the IHO is an area that the Court is reluctant to enter into. The Court was not present at the hearings, and should not reassess the credibility of witnesses that testified before the IHO. *See Cabouli v. Chappaqua Cent. School Dist.*, 202 Fed.Appx. 519, 522 (2d Cir. 2006) (holding district courts should defer to hearing officer's finding on the credibility and reliability of evidence of witnesses who testified before her). The Court declines to find that the IHO did not consider the testimony of the Parent's witnesses. The Final Decision and order cites to both parties' witnesses, and the Court declines to substitute its own

judgment for that of the IHO on the question of witness credibility.

H.   **Additional Evaluations without Parental Consent**

The IHO, in her Final Decision and Order, ordered that the Student be evaluated for visual perception and visual scanning behavior. Additionally, The IHO ordered that the Student receive a speech language evaluation and an audiological/hearing evaluation. The IHO also overrode any lack of parental consent to the evaluations. In the Complaint, the Plaintiff alleges that this aspect of the decision was improper because it was a direct violation of 34 C.F.R. § 300.505(b), which provides for how a Board may pursue evaluations if the parent does not consent. Plaintiffs did not raise the issue in their Motion for Summary Judgment, nor did they provide any argument in their objection to the Defendants' Motion for Summary Judgment, which argued that the IHO's decision was proper.[6]

The Parent withheld consent for additional testing to determine if there was a visual scanning abnormality at the PPT meeting on December 20, 2011. She also withheld consent for speech language and audiological evaluations in the same PPT meeting. 34 C.F.R. § 300.505(b) provides that "[i]f the parents of a child with a disability refuse consent for initial evaluation or a reevaluation, the agency may continue to pursue those evaluations by using the due process procedures under §§ 300.507–300.509, or the mediation procedures under § 300.506 if appropriate. . . ." 34 C.F.R. § 300.505(b). The Parents do not specify how the Board failed to comply with these procedures, other than noting that the Defendants raised the request during the hearing.

---

[6] The Court notes that when a counseled party responds only in part to a motion for summary judgment, the court "may . . . infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned." *Jackson v. Federal Exp.*, 766 F.3d 189, 198 (2d Cir. 2014). The Court, in addition to finding that there is no merit to Plaintiff's arguments, finds that Plaintiff also abandoned this argument by not responding to the Defendant's Motion for Summary Judgment on this point.

The Defendants argue that the IHO's decision was appropriate in light of federal and Connecticut state law. The IHO may order special education evaluations without a parent's consent in a due process hearing. *See* 34 C.F.R. § 300.505(b); Conn. Gen. Stat. § 10-76h(d)(1) ("In the case where a parent or guardian, or pupil if such pupil is an emancipated minor or is eighteen years of age or older, or a surrogate parent appointed pursuant to section 10-94g, has refused consent for initial evaluation or reevaluation, the hearing officer or board may order an initial evaluation or reevaluation without the consent of such parent, guardian, pupil or surrogate parent . . . ."). This argument was unopposed by the Plaintiff, and as such, the Court finds that the IHO properly ordered the additional evaluations without parental consent.

I.   **First Amendment Claim**

Plaintiff requests in her Complaint that the Court reverse the IHO's Final Decision and Order because it orders placement of the Student at a Board high school, and this violates the Parent's First Amendment right to control the child's education. Plaintiff did not raise this argument in her Motion for Summary Judgment, nor did she respond to the Defendants' argument against this claim in the Summary Judgment motion. The Court deems the Defendants' Summary Judgment Motion on this issue unopposed.

Furthermore, the claim is frivolous. While the Supreme Court has recognized a parent's right to direct the education of their child under the Fourteenth Amendment, *Pierce v. Society of Sisters*, 268 U.S. 510 (1925), the IHO's decision did not impinge on that right. Nor does it impinge on any right to freedom of religion or speech protected by the First Amendment. The IHO did not require that the Student be placed at a Board high school. The IHO only held that placement at a Board high

school was all that the Plaintiff was entitled to under the IDEA. Plaintiff was free to pay to send the

Student to a private school of her choosing. The opinion did nothing to limit that opportunity. The

Court holds that the Plaintiff's First Amendment rights were not denied by the IHO's opinion.

J.     **Current Stay-Put Placement**

In the Plaintiff's Complaint, she prays for:

declaratory relief establishing that he child's current educational placement at Easton
Country Day School (hereinafter "ECDS") is the 'then-current educational
appropriate educational placement' pending the administrative hearing and appeal for
purposes of the 'stay put' provision of IDEA 1415(j), Conn. Gen. Stat. § 10-76d and
Connecticut Agencies Regulations . . . § 10-76d-16; and that the hearing officer's
order to return the Student to the Board high school has no force of law and violates
the Parent's First Amendment right . . . .

Complaint, p. 3–4. Plaintiff makes no further argument to this effect in her Motion for Summary

Judgment, nor does she respond to the argument to the contrary in Defendants' Motion for Summary

Judgment. For this reason, the Defendants' argument is deemed unopposed.

Under 20 U.S.C. § 1415(j) of the IDEA, during the pendency of proceeding related to an

IDEA case, the Student must remain in the "then-current educational placement" of the child. 20

U.S.C. § 1415(j). A then-current educational placement within the meaning of the IDEA does not

mean that the Student is entitled to stay in a private placement at the expense of the Board. Instead,

it means that the last recommended IEP placement remains in place during the pendency of the

hearings. *See Zvi D. by Shirley D. v. Ambach*, 694 F.2d 904, 908 (2d Cir. 1982). The Student's then-

current educational placement is at a Board high school, not at ECDS. Because the Final Decision

and Order did not change the Student's placement from the Board's high school to ECDS, the stay-

put placement is the Board's high school under the last IEP. *Board of Educ. of Pawling Central*

*School Dist. v. Schutz*, 290 F.3d 476, 482 (2d Cir. 2002).

K.    **Reimbursement for tuition, support services**

Plaintiff argues that the IHO erred in finding that the Parent should not be reimbursed for the

Student's placement at ECDS. The review undertaken by the Court of a state agency's determination

as to parents' entitlement to reimbursement for a private placement under the IDEA is a familiar one:

> When parents unilaterally enroll their child in a private school, we apply the three-part *Burlington-Carter* test to determine whether they should be reimbursed. Under the test, we look at '(1) whether the school district's proposed plan will provide the child with a free appropriate public education [("FAPE")]; (2) whether the parents' private placement is appropriate to the child's needs; and (3) a consideration of the equities.'

*J.C. v. New York City Dep't of Educ.*, 643 F. App'x 31 (2d Cir. 2016) (quoting *C.F.*, 746 F.3d at 73).[7]

As explained supra, the Student was not denied a FAPE. Having concluded that the Board provided

a FAPE to the Student, the Parent should not be reimbursed for a private placement. The Court does

not need to reach the question of whether the private placement is appropriate to the child's needs or

the equities, given that the FAPE was adequate. *M.C. ex rel Mrs. C. v. Voluntown Bd. of Educ.*, 226

F.3d 60, 66 (2d Cir. 2000).

L.    **Discrimination under the Americans with Disabilities Act and the Rehabilitation Act**

Parent, in her Complaint, alleges that the Student was discriminated against because of her

disabilities in violation of Title II of the Americans with Disabilities Act and Section 504 of the

Rehabilitation Act of 1973. She does not raise this argument in her Motion for Summary Judgment,

---

[7] The Second Circuit's phrase "*Burlington-Carter* test" refers to the Supreme Court decisions in *School Committee of Burlington, Mass. v. Department of Education of Mass.*, 471 U.S. 359 (1985) and *Florence County School District Four v. Carter ex rel. Carter*, 510 U.S. 7 (1993). *See Frank G. v. Board of Educ. of N.Y.*, 459 F.3d 356, 363-64 (2d Cir. 2006).

nor does she respond to the arguments against this allegation in the Defendants' Motion for Summary Judgment. For this reason, the Defendants' Motion for Summary judgment is deemed unopposed on this question. However, the Court will also briefly review the merits of this argument.

Title II of the Americans with Disabilities Act states that "no qualified individuals with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Section 504 of the Rehabilitation Act of 1973 states that "[n]o qualified handicapped person shall, on the basis of handicap, be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any program or activity which receives Federal financial assistance." 34 C.F.R. § 104.4(a).

The Second Circuit has noted that the standard under both statutes is the same, in most cases. *Harris v. Mills*, 572 F.3d 66, 73 (2d Cir. 2009).

> In order for a plaintiff to establish a *prima facie* violation under these Acts, she must demonstrate (1) that she is a qualified individual with a disability; (2) that the defendants are subject to one of the Acts; (3) that she was denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or was otherwise discriminated against by defendants, by reason of her disability.

*Id.* at 73–74 (*quoting Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 84–85 (2d Cir), *corrected*, 511 F.3d 238 (2d Cir. 2004)). The Board admits in their motion for summary judgment that it is subject to both Title II and Section 504 because it receives federal funding and that the Student is a person with a disability under Title II and Section 504.

At issue then is whether the Student "'was denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or was otherwise discriminated against by

defendants, by reason of her disability.'" *Id.* Without any argument from the Plaintiff, it is impossible for the Court to conclude that she was denied participation in any program or benefit, to say nothing of whether the denial was by reason of the Student's disability. The Court has already concluded that the Student was not denied a FAPE, and that the IEP provided was appropriate to meet the requirements of the IDEA. Additionally, under Section 504, the Plaintiff would need to demonstrate bad faith or gross misjudgment with regards to the Student. *M.K. ex rel. Mrs. K. v. Sergi*, 554 F.Supp.2d 175, 195 (D.Conn. 2008). The Court finds no support in the record of either bad faith or gross misjudgment on the part of the Board. The Court holds that there was no discrimination under Title II or Section 504 of the Rehabilitation Act.

M.   **Retaliation**

Parent, in her Complaint, alleges that the Student was retaliated against because of her disabilities in Section 504 of the Rehabilitation Act of 1973. She does not raise this argument in her Motion for Summary Judgment, nor does she respond to the arguments against this allegation in the Defendants' Motion for Summary Judgment. Nor does the Plaintiff include in her Local Rule 56(a) statement any facts to support this claim. For this reason, the Court considers Plaintiff's argument abandoned. However, the Court will briefly review the merits of the argument.

Under Section 504, "[n]o recipient or other person shall intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by section 601 of the Act or this part, or because he has made a complaint, testified, assisted, or participated in any manner in any investigation, proceeding or hearing under this part." 34 C.F.R. § 100.7(e). Retaliation under the Rehabilitation Act is analyzed under the same standards as the

ADA. *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002). The same burden-shifting framework for Title VII cases applies to retaliation cases under Section 504 and the ADA. *Id.* In order to demonstrate a *prima facie* of retaliation, the Plaintiff must show "that: (1) he engaged in an activity protected by the ADA; (2) the [Board] was aware of this activity; (3) the employer took adverse [] action against him; and (4) a causal connection exists between the alleged adverse action and the protected activity." *Id.* Once a *prima facie* case is established, the burden shifts to the Board to demonstrate that there is a legitimate, non-discriminatory reason for the alleged conduct. *DeCintio v. Westchester County Medical Center*, 821 F.2d 111, 115 (2d Cir. 1987). The burden then shifts back to the Parent to demonstrate that the reason given by the Board is pretextual. *Id.*

Plaintiff alleges several forms of retaliation. First, she alleges that in retaliation for the Parent's advocacy for the Student's needs, the Board reported the Student's illnesses to the Department of Children and Family ("DCF") as "educational refusal by mother" and "educational neglect and social deprivation." Complaint, p. 14. Additionally, Plaintiff alleges retaliation because the Board made false allegations of excessive absenteeism and referred the Student to the truancy authority after excused medical absences. The Parent alleges that the Student was placed in detention, penalized for handing in work late, and that both she and the Student were threatened with a referral to DCF and court action. This conduct allegedly occurred in 2009.  In addition, in 2009, the Plaintiff alleges that an attendance goal of 95% was added to the Student's IEP, though the Student was suffering from persistent bronchitis.

The Plaintiff, by advocating zealously for her daughter, certainly undertook a protected activity under the statutes in question. Additionally, the Board was clearly aware that the Parent was

advocating for her daughter. An adverse decision or course of action against a Plaintiff in a retaliation claim under Section 504 can include conduct such as "threatening (and instituting) child welfare investigations in response to plaintiffs' medically excused absences from school." *Weixel v. Board of Educ. of City of New York*, 287 F.3d 138, 149 (2d Cir. 2002). Here, Plaintiff has alleged that she threatened with and was reported to DCS and that she was also reported to a truancy authority regarding medically excused absences. She has articulated in her Complaint an adverse course of action that would allow the Court to find a genuine issue of material fact as to whether the Board had undertaken an adverse decision against the Parent.

However, a Plaintiff must also demonstrate a causal connection between the adverse action and the Plaintiff's protected activity. "A plaintiff may prove causal connection between plaintiff's protected activity and defendant's adverse action either directly or indirectly." *Phillippeaux v. Fashion Institute of Tech.*, 1996 WL 164462, at *8 (S.D.N.Y. Apr. 9, 1996). Direct evidence of retaliatory animus directed towards a plaintiff is sufficient to show a causal connection. *DeCintio v. Westchester County Medical Center*, 821 F.2d 111, 115 (2d Cir. 1987). Indirect evidence of a causal connection between an adverse action and the plaintiff's protected activity can be demonstrated by showing that the "protected activity was followed closely by discriminatory treatment, or through other evidence such as disparate treatment of [others similarly situated] who engaged in similar conduct." *Id.* Plaintiff makes no such allegations in her Complaint. She offers no allegations that the Board articulated a retaliatory animus when undertaking these activities, no allegations that the Board treated other Parents and Students in similar situations differently, or any particular connection in time between a particular fight between the Parent and the Board and the

actions discussed above. Plaintiff's failure to provide any argument on this point and failure to include any facts to support this argument leaves only the Complaint, which on its face, does not allege with any specificity any causal connection between the adverse action and the Plaintiff's protected activity beyond a conclusory allegation that the actions of the Defendants were retaliatory. The Defendants' Motion for Summary Judgment on the issue of retaliation is granted.

N.   **Punitive Damages**

Plaintiff requests punitive damages for "the intentional acts of discrimination and retaliation by the defendants . . . pursuant to Section 504 of the Rehabilitation Act of 1973; 20 U.S.C. § 794; the Americans with Disabilities Act, § [sic]42 U.S.C. [sic] 12117; and the Civil Rights Act, § [sic] 42 U.S.C. § 1983." Complaint, p. 18.  As discussed supra, the Court found no discrimination or retaliation by the Board under the ADA or the Rehabilitation Act. Furthermore, "punitive damages . . . may not be awarded in suits brought under § 202 of the ADA and § 504 of the Rehabilitation Act." *Barnes v. Gorman*, 536 U.S. 181, 189 (2002).

Nor are punitive damages available under 42 U.S.C. § 1983. Firstly, there was no § 1983 violation. "Section 1983 imposes liability on anyone who, under color of state law, deprives a person 'of any rights, privileges, or immunities secured by the Constitution and laws.'" *Blessing v. Freestone*, 520 U.S. 329 (1997) (*quoting* 42 U.S.C. § 1983). The Court, in the analysis above, has not found any violation of a federal right that would substantiate a § 1983 claim. Moreover, "a municipality is immune from punitive damages under 42 U.S.C. § 1983." *Newport v. Fact Concerts*, 453 U.S. 247, 271 (1981). Furthermore, as Defendants note, "local school boards are municipal bodies for the purposes of the Eleventh Amendment." *A. ex rel. A. v. Hartford Bd. Of Educ.*, 976

F.Supp.2d 164, 196 (D.Conn. 2013) (quoting *Rosa R. v. Connelly*, 889 F.2d 435, 437 (2d Cir. 1989)). Plaintiff's request for punitive damages is denied.

O.     **Monetary Damages**

Plaintiff requests "compensatory damages, including monetary damages for emotional and physical pain and suffering to compensate the Parent and Student for economic detriments and the deterioration of the Student's health caused and/or exacerbated by the defendants discriminatory and retaliatory acts against them in violation of Section 504 of the Rehabilitation Act of 1973; 20 U.S.C. § 794; the Americans with Disabilities Act, § [sic]42 U.S.C. [sic] 12117; and the Civil Rights Act, § [sic] 42 U.S.C. § 1983." Complaint, pp. 17–18. As discussed supra, the Court found neither discrimination or retaliation by the Board under the ADA, the Rehabilitation Act nor any denial of a federal right under § 1983.[8]

P.     **Qualified Immunity**

Defendants, in their Motion for Summary Judgment, argue that even if the Court found violations of Section 504, the ADA, and § 1983, that the individually named defendants are entitled to qualified immunity. The Court found no violations of the above-mentioned statutes. Having found no violations, the Court need not consider whether or not the Defendants would, hypothetically, be entitled to qualified immunity.

Q.     **Attorneys' fees**

Plaintiff, in her Complaint, requests that the Court grant attorney's fees for the administrative

---

[8] The Second Circuit allows for § 1983 claims based on a denial of procedural or administrative remedies provided under the IDEA. *Streck v. Board of Educ. of East Greenbush Sch. Dist.*, 280 F.App'x 66, 68 (2d Cir. 2008) (Summary Order). There is no evidence of a denial of any procedural or administrative remedy under the IDEA in this case.

hearing and the appeal of the hearing officer's decision. The briefs on these motions do not address that issue in any detail. This Ruling gives preliminary consideration to Plaintiff's effort to recover her attorney's fees.

Under the IDEA, attorneys' fees are available to a Parent where she can demonstrate that she is the prevailing party. 20 U.S.C. § 1415(i)(3)(i). A party need not prevail on every issue to be designated a "prevailing" party for this purpose. *Hensley v. Eckhart*, 461 U.S. 424, 433 (1983) (construing 42 U.S.C. § 1988, which provides that in a federal civil rights action, the district court "may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs."); *See also I.B. v. New York City Dept. of Educ.*, 336 F.3d 79, 80 (2d Cir. 2003) ("We interpret the IDEA fee provisions in consonance with those of other civil rights fee-shifting statutes."). The Second Circuit has held that "to be considered a prevailing party, a plaintiff must not only achieve some material alteration of the legal relationship of the parties, but the change must also be judicially sanctioned." *Ma v. Chertoff*, 547 F.3d 342, 344 (2d Cir. 2008) (internal quotations omitted).

In the case at bar, Plaintiff has failed in her principal substantive claims against the Board of Education and the individual Defendants. The IHO concluded that the Board's program for the Student during the 2011-2012 academic year was appropriate, and that in consequence the Parent was not entitled to reimbursement for the Student's private placement at Easton Country Day School and related expenses. For the reasons stated, the Court declines to disturb those conclusions.

However, the Court rejects the IHO's conclusion that the Parent was not entitled to reimbursement for the IEE conducted by Dr. Cherkes-Julkowski. With respect to that discrete issue,

44

Plaintiff succeeds. That partial success is sufficient to qualify Plaintiff as a "prevailing party" for purposes of the fee-shifting statute. It satisfies the three-stage test laid down by a case like *Ma v. Chertoff*. When one considers the importance and cost of an IEE in an IDEA case of this nature, I conclude without difficulty that requiring the Board to bear that expense rather than the Parent amounts to a "material alteration of the legal relationship of the parties," which is "judicially sanctioned" because the Court mandates it in this Ruling.

The result is that the Plaintiff, in the administrative proceedings and the subsequent litigation with Defendants in this Court, has achieved  only a partial and limited success: a not unusual circumstance. The Supreme Court addressed that circumstance directly in *Hensley*: where "a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount. This will be true even where the plaintiff's claims were interrelated, non-frivolous, and raised in good faith." 461 U.S. at 436. Based on that principle, the Court further held in *Hensley* that "[w]here the plaintiff has failed to prevail on a claim that is distinct in all respects from his successful claims, the hours spent on the successful claim should be excluded in considering the amount of a reasonable fee." *Id.* at 440.  That holding applies to the case at bar because the determination of which party is obligated to pay for an IEE— a parent or the board of education—is distinct from and irrelevant to deciding the merits of the underlying issue of appropriate student placement.

In *Hensley,* the Supreme Court suggested two alternative procedures for district courts to utilize in reducing such attorney's fees: "The district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success."  461

U.S. at 436–37. In my prior judgments, I have used both procedures: the first in the *Handschu v. Special Services Division* civil rights class action, *see* 679 F.Supp.2d 488, 499–500 (S.D.N.Y. 2010), 727 F.Supp.2d 239 (S.D.N.Y. 2010); and the second in *Sheehan v. Metropolitan Life Insurance Co.*, 450 F.Supp.2d 321, 330 (S.D.N.Y. 2006). Those decisions illustrate the alternative manners in which *Hensley*-mandated reduction in an attorney's fee application is implemented.

I will consider the question of attorney's fees in the present case if and when Plaintiff submits a quantified claim in the proper form. "Proper form" requires that Plaintiff's attorney (1) comply fully with the Second Circuit's detailed instructions in *New York Ass'n of Retarded Children v. Carey*, 711 F.2d 1136, 1148 (2d Cir 1983); and (2) limit the claim to the attorney hours spent on the IEE issue, excluding all others. If Plaintiff decides to press such a claim, it must be submitted not later than December 21, 2016, and will then be subject to further submissions.

## IV.   FURTHER ANALYSIS

This is a difficult case. The difficulties arise from qualities inherent in the human spirit which affect every person involved, on one side or the other.

Parents love and protect their children. A handicapped child calls forth from a loving parent extra measures of protection, care and concern. Parents fight for children with special needs.

School board members, teachers and administrators are responsible for all the children in their charge, each child with differing strengths and needs, each requiring appropriate resources, all within the confines of limited budgets subject to the control of taxpayers and politicians, some of whom may not place as high a priority on education as parents, school boards or teachers do.

It is not surprising, therefore, that in a case like this one, a lengthy administrative record is

replete with evidence of the battle this Plaintiff Parent fought for her Student daughter; evidence of the school-related Defendants' efforts on behalf of the Student and their responses to the Parent's numerous demands; and indications that, as the process continued, elements of recrimination and contentiousness began to seep in. How could it be otherwise? Tensions and passions are close to the surface in these cases because the towering importance of a child's well-being on the one hand, and a school board's responsibility to the community on the other, impact directly on the spirits of all people involved .

It is equally unsurprising to discover that when an IDEA case comes before a federal district court, the trial judge is bound by instructions imposed by higher authority that place distinct limitations upon the judge's powers to decide the case.

In *Board of Education v. Rowley*, 458 U.S. 176 (1982), the Supreme Court considered for the first time the nature and extent of the district court's authority to review a state's compliance with the precursor statute to the IDEA.[9]  The child in question was deaf. The district court held that the school board denied her a "free appropriate public education" (FAPE) because it refused to supply a sign-language interpreter in the classroom; the court reached that conclusion by defining a FAPE as "an opportunity to achieve her full potential commensurate with the opportunity provided to other children." 458 U.S. at 185–186.  The Second Circuit affirmed.

The Supreme Court reversed.  It held that "a court's inquiry in suits brought under [the Act] is twofold.  First, has the State comlied with the procedures set forth in the Act?  And second, is the individualized educational program developed through the Act's procedures reasonably calculated

---

[9]  The statute was then titled Education of the Handicapped Act, 84 Stat. 175, as amended, 20 U.S.C. § 1401 *et seq.*

to enable the child to receive educational benefits?"  *Id.* at 206-207.  "If these requirements are met," the Court continued, "the State has complied with the obligations imposed by Congress and the courts can require no more."  *Id*. at 207.  Warming to its subject, the *Rowley* Court went on to say:

> We previously have cautioned that courts lack the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy . . . .  Congress' intention was not that the Act displace the primacy of the States in the field of education, but that the States receive funds to assist them in extending their educational systems to the handicapped.  Therefore, once a court determines that the requirements of the Act have been met, questions of methodology are for resolution by the States.

458 U.S. at 208.  Measured by that standard, the lower courts' judgments that the school board had to provide an interpreter were beyond their authority and could not stand.  "Neither the District Court nor the Court of Appeals found that petitioners had failed to comply with the procedures of the Act, and the findings of neither court would support a conclusion that Amy's educational program failed to comply with the substantive requirements of the Act."  *Id*. at 209.  Given that record, and the fact "that Amy was receiving personalized instruction and related services calculated by the Furnace Woods school administrators to meet her educational needs, the lower courts should not have concluded that the Act requires the provisions of a sign-language interpreter."  *Id*.

The Supreme Court has never retreated from this holding in *Rowley*.  The Second Circuit adhered to the *Rowley* rule in a more recent series of cases, including *Cerra v. Pawling Central School District*, 427 F.3d 186 (2d Cir. 2005), and *Walczak v. Florida Union Free School District*, 142 F.3d 119 (2d Cir. 1998).  In both  cases  the Second Circuit reversed a district court 's judgment granting a parent reimbursement for private school placement for a handicapped child.  Each trial court reviewed the administrative record and concluded that the public school district's plan for the

48

child was inadequate to provide the child with an appropriate education.  The Second Circuit reversed each case  and remanded with instructions to enter judgment for the school district.  An earlier section of this Ruling included Circuit Judge Parker's observation in *Cerra*: "Because administrative agencies have special expertise in making judgments concerning student progress, deference is particularly important when assessing an IEP's substantive adequacy." 427 F.3d at 195. For purposes of this further analysis, it is useful to reproduce a longer quotation from *Cerra:*

>    Under *Rowley*, a school district complies with IDEA's substantive requirements if a student's IEP is "reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 207. A school district is not, however, required to furnish "every special service necessary to maximize each handicapped child's potential." *Id*. at 199. . . . Rather, a school district fulfills its substantive obligations under the IDEA if it provides an IEP that is "likely to produce progress, not regression," and if the IEP affords the student with an opportunity greater than mere "trivial advancement." *Walczak*, 142 F.3d at 130.

>    In order to avoid impermissibly meddling in state educational methodology, a district court must examine the record for any objective evidence indicating whether the child is likely to make progress or regress under the proposed plan.  Because administrative agencies have special expertise in making judgments concerning student progress, deference is particularly important when assessing an IEP's substantive adequacy.  An assessment of educational progress is a type of judgment for which the district court should defer to the SRO's educational experience, particularly where the district court's decision was based solely on the record that was before the SRO.  We have not hesitated to vacate district court opinions where the district court erred in its substituting its judgment for that of the agency experts and the hearing officer. . . . We believe the district court thus inappropriately substituted its own subjective judgment about what are appropriate measures for educational progress.

427 F.3d at 194–195 (some citations, internal quotation marks, parentheses and ellipses omitted).

>    Addressing these issues in *Walczak*, the Second Circuit said:

> While the parents' wishes are understandable, IDEA does not require states to develop IEPs that maximize the potential of handicapped
> children.  What the statute guarantees is an "appropriate" education,

not one that provides everything that may be thought desirable by
loving parents.

142 F.3d at 132 (citations and some internal quotation marks omitted).

As a district judge, I must view the extensive administrative record in this case through t the

prism of these Supreme Court and Second Circuit decisions, whose narrowing effect instructs me

about  what I can and cannot do. I am told in no uncertain terms that I cannot resolve the disputes

between Parent and Board of Education as if I were a common law judge conducting a bench trial.

To be sure, the Conference Committee report on the initial IDEA statute said that courts were to

make "independent decision[s] based on a preponderance of the evidence." S. Conf.Rep. No. 94-455,

p. 50 (1975), U.S.Code Cong. & Admin.News 1975, p. 1503.   But this is not a jurisprudential

concept Lord Coke would recognize.  In *Rowley* the Supreme Court stated bluntly that "the provision

that a reviewing court base its decision on the 'preponderance of the evidence' is by no means an

invitation to substitute their own notions of sound educational policy for those of the school

authorities which they review." 458 U.S. at 206. *Rowley* holds that if the district court concludes  the

school board complied with the Act's procedures and its substantive requirements, that is the end of

the case: "If these requirements are met," the *Rowley* Court said, "the State has complied with the

obligations imposed by Congress *and the courts can require no more*," *id.* at 207; as a practical

matter, the concluding emphasized phrase should be understood as a caution to trial judges that the

district court will be reversed if it tries to do more.

Two immediate impressions emerge from the voluminous record in this case, whose essence

I have sought to capture in Part I.  The first inescapable impression is that the Parent persevered with

unflagging devotion and determination to achieve the wholly natural objective of maximizing her

50

daughter's educational progress, and ultimately the quality of the child's life.

The second inescapable impression is that the New Haven Board of Education and the individual Defendants, confronted with the Student's needs, did not ignore, shrug off or treat cavalierly the Parent's vigorous efforts. Instead, the Defendants concerned paid attention to the Parent's requests, complaints and demands; expended considerable resources in responding to them, in forms which included private meetings, class and curriculum rearrangements, and consultations with specialists. The Board-appointed Placement and Planning Team met repeatedly to consider the Student's educational needs; the Parent attended those meetings and the two due process hearings before the IHO, at which, mutual agreement not having been reached, the Board explained and defended its efforts to satisfy the Student's educational needs.

The Court has carefully considered the administrative record and the well-crafted briefs of counsel on these cross-motions. While the Parent's concern is natural, the sincerity of her criticisms manifest, her frustration and discontent wholly understandable, I am unable to conclude that the Defendants failed to comply with the procedures of the IDEA, or that their educational program for the Student failed to comply with the substantive requirements of the Act. On the contrary: I conclude that the Defendants satisfied those requirements.

The reasons for those conclusions by the Court are stated in detail in Part III. They may be summarized thus: The Parent and the Board of Education disagree about the particular aids, remedies and teaching tools the Student should receive as part of an education appropriate to the Student's particular needs. The Parent says that without these additional measures, the Student cannot receive an appropriate education. The Board responds that the measures it has taken result in the IDEA-

mandated appropriate public education for the Student. The gravamen of the Plaintiff Parent's complaint in this action is that the Court should agree with her, and disagree with the Board, about what the components of an appropriate education for the Student should be.

Suppose, for the sake of the analysis only, I accepted the Parent's contentions entirely, and gave a judgment requiring the Board to furnish additional services or reimburse the Parent for the cost of obtaining them elsewhere. Were I to do this, I think it inevitable that the Second Circuit would chastise me for the same error into which the district judge fell in *Cerra*: "We believe," Judge Parker said disapprovingly, "the district court thus inappropriately substituted its own subjective judgment about what are appropriate measures for educational progress." 427 F.3d at 195. The court of appeals does not allow district courts to indulge in that sort of substitution. The *Cerra* opinion continued by saying that "the district court's determination that Kathryn was unlikely to make progress under the proposed IEP is precisely the kind of educational policy decision a district court may not make absent objective evidence in the record suggesting that the [State Review Officer] has reached an erroneous conclusion." *Id*. at 196. The Plaintiff at bar does not demonstrate the presence of objective evidence in this record that would sustain that conclusion.

The Supreme Court in *Rowley* casts that prohibition in terms of a statutory denial of authority; the Second Circuit cases speak more in the judicial language of deference owed by a district judge to school authorities; the difference in rationales makes no difference, the inhibition laid upon district judges is clear in either event. *Cerra* echoes the prohibition first articulated by the Supreme Court in *Rowley*: "once a court determines that the requirements of the Act have been met, questions of methodology are for resolution by the States." 458 U.S. at 208. The disputes between

the Parent and the Board in this case turn exclusively upon questions of methodology. If the Board has met the requirements of the Act, such questions lie beyond the competence of this district court to adjudicate.

I conclude in this case that the Board meets that requirement. After considerable effort and consultations, the Board fashioned an IEP for the Student that "is likely to produce progress, not regression," a relatively modest yardstick that "does not secure the best education money can buy," but asks only that "the door of public education must be opened for a disabled child in a meaningful way." *Walczak*, 142 F.3d at 130 (citations and internal quotation marks omitted).[10] The record in this case compels the conclusion that the considerable efforts of New Haven Board of Education opened that door for this Student.

## VI.  CONCLUSION

For the foregoing reasons, the Plaintiff's Motion for Summary Judgment [Doc. 36] is GRANTED in part and DENIED in part.

Defendants' Motion for Summary Judgment [Doc. 37] is GRANTED in part and DENIED in part.

As a result of the foregoing, the IHO's decision is REVERSED in part, and Defendants are ordered to reimburse Plaintiff for the costs of the independent educational evaluation performed by Dr. Cherkes-Julkowski.

---

[10]  There is objective evidence in the record that the Student's public school education was progressing, not regressing.  In 2011, a school administrator determined on the basis of curriculum-based assignments that her math assessment placed her in Algebra I or higher, and her reading assessment was at ninth grade level.  The Student was born in 1995, and was age 16 at the time of these assessments.

Plaintiff's present submission does not include an itemized statement of costs and attorneys' fees for which Plaintiff claims reimbursement and this Ruling awards in part. Accordingly, a judgment cannot be entered and this case closed at this time. If the Plaintiff desires to press claims for costs and fees, she must file supporting papers not later than they must do so no later than December 21, 2016. Plaintiff is reminded that the claim for attorneys' fees must comply with the Second Circuit's decision in *New York Ass'n of Retarded Children v. Carey*, 711 F.2d 1136, 1148 (2d Cir. 1983), which requires that the documentation include "for each attorney, the date, the hours expended, and the nature of the work done." Plaintiff should also note that the Court is required to conduct a "'lodestar' analysis, which calculates reasonable attorneys' fees by multiplying the reasonable hours expended on the action by a reasonable hourly rate." *Kroshnyi v. U.S. Pack Courier Servs., Inc.*, 771 F.3d 93, 108 (2d Cir. 2014).

Defendants are entitled to oppose the claims for costs and fees, in whole or in part. Any opposition must be filed within fourteen (14) calendar days of the service of Plaintiff's claim upon them.

It is SO ORDERED.

Dated:   New Haven, Connecticut
         November 30, 2016


*/s/ Charles S. Haight, Jr.*
CHARLES S. HAIGHT, JR.
Senior United States Judge